# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

FLEXSYS AMERICA LP,                  )        CASE NO. 5:05CV156
                                     )
                    PLAINTIFF,       )        JUDGE SARA LIOI
                                     )
vs.                                  )
                                     )        MEMORANDUM OPINION
                                     )        (Nunc Pro Tunc)[1]
                                     )
KUMHO TIRE U.S.A., INC., et al.,     )
                                     )
                                     )
                    DEFENDANTS.      )

This patent matter comes before the Court on the motion of Defendants Sinorgchem Co., Shandong Sinorgchem International Chemical Industry Co., Ltd., Singorgchem Co., Tai'an, Tongling Xinda Chemical Co., Ltd., Anhui Sinorgchem Technology Co., Ltd., and Jiangsu Sinorgchem Technology Co., Ltd. (collectively "Sinorgchem") for summary judgment on the issue of non-infringement. (Doc. No. 268.) In a separate motion, Defendants Kumho Tire USA, Inc., Kumho Tire Co., Inc., and Korea Kumho Petrochemical Co., Ltd. ("KKPC") (collectively "Kumho") also request summary judgment on the issue of non-infringement. (Doc. No. 275.) Both motions seek the dismissal of all claims in the Amended Complaint.

---

[1] In its original Memorandum Opinion and Judgment Entry, filed July 6, 2010, the Court inadvertently indicated that the case was dismissed. Inasmuch as several counter and cross claims remain following the Court's ruling on summary judgment, an amended Memorandum Opinion was filed on July 12, 2010 to reflect the fact that this case remains open. (Doc. No. 351.) Consistent with the contemporaneously filed Opinion and Order granting, in part, Sinorgchem's motion to seal portions of the summary judgment ruling, the Court files this second amended Memorandum Opinion to remove references to certain information Sinorgchem views as confidential.

## I. Background

For purposes of this litigation, Plaintiff Flexsys America LP ("Flexsys") is the holder of several patents, including: United States Patent No. 5,117,063 ("the '063 patent"), United States Patent No. 5,453,541 ("the '541 patent"), and United States Patent No. 5,608,111 ("the '111 patent"). The '541 patent, issued on a continuation-in-part application, is based on the '063 patent.[2] The '111 patent, in turn, is based on a continuation of the '541 patent. The '541 patent was previously dismissed from this suit.[3]

*The Process*

The patents-in-suit identify a new, environmentally-friendly method for making 4-aminodiphenylamine (4-ADPA) and its alkylated derivatives, namely alkylated p-phenylenediamines. These derivatives are used as anti-degradants in automobile tires. The patents identify a three-step process: (1) the coupling of aniline and nitrobenzene to produce 4-ADPA intermediates; (2) hydrogenating the 4-ADPA intermediates into 4-ADPA; and (3) alkylating 4-ADPA to form the antidegradant additive, N-(1,2-dimethylbutyl)-N'-phenyl-p-phenylemediamine (6PPD).

The '063 and '111 patents focus on the coupling step. During this initial phase, aniline is combined directly with nitrobenzene in an environment containing a suitable base, solvent, and protic material—a substance, such as water or methanol, which is capable of donating a proton to the reaction. The earliest patent, the '063 patent, represented a significant departure from the traditional method of making antidegradant

---

[2] The '063 patent issued on May 26, 1992, the '541 patent issued on September 26, 1995, and the '111 patent issued on March 4, 1997. Copies of the patents are contained in the parties' joint appendix to claim construction. (*See* Doc. No. 213, Tab A, '063 patent; Doc. No. 68, Tab B, '541 patent; Tab C, '111 patent).
[3] Another patent, United States Patent No. 6,140,538, was alleged in the complaint but was dismissed with the '541 patent.

additives. Prior to Plaintiff's invention, the conventional process for creating 6PPD involved coupling aniline with chlorinated nitrobenzene. By eliminating chlorine from the process, the '063 inventors were able to produce the desired 6PPD without the highly corrosive chlorinated waste by-products. The same chlorine-free process was carried through the '541 and '111 patents.

In 1997, Sinorgchem began working on its own process for producing 4-ADPA and 6PPD. Sinorgchem acknowledges that it was aware of the '063 and '111 patents, but claims that it understood that the process outlined in those pre-existing patents relied on the presence of protic material, i.e., water, in amounts less than "up to about 4%" of the reaction mixture volume when aniline was the solvent. Because Sinorgchem's process always utilized water in amounts significantly greater than 4%, Sinorgchem believed that it could produce 4-ADPA and 6PPD without infringing upon the patents held by Flexsys.

KKPC is in the business of manufacturing and selling chemicals related to rubber and semiconductors. (Doc. No. 276, Ex. 2, Declaration of Sung Kyu Lim at ¶ 1.) KKPC produces 6PPD, and purchases the precursor chemical, 4-ADPA, to make 6PPD for use in the manufacture of tires.[4] (*Id.* at ¶ 4.) In 1987, KKPC entered into a joint venture with Monsanto, wherein Monsanto agreed to supply KKPC with 4-ADPA. (*Id.* at ¶ 6.) In 1995, Monsanto spun this portion of its business off to the newly formed Flexsys, and KKPC began purchasing 4-ADPA from Flexsys. (*Id.* at ¶¶ 10-11.) When the relationship between KKPC and Flexsys soured, KKPC sought alternative suppliers to

---

[4] Prior to 1995, KKPC also produced 4-ADPA. (*Id.* at ¶ 11.)

satisfy its need for 4-ADPA. (*Id.* at ¶¶ 13, 16.) In 2004, KKPC began purchasing 4-ADPA from Sinorgchem. (*Id.* at ¶ 16.)

It is not disputed that the remaining two Kumho defendants do not produce any chemicals and do not practice any of the steps outlined in the patents-in-suit. Kumho Tire Co., Inc. is in the business of producing tires, and Kumho Tires U.S.A., Inc. imports the tires produced by Kumho Tire Co., Inc. into the United States for distribution to various retailers. (*Id.* at ¶ 2.)

### Litigation History

While the parties have already litigated this matter before the International Trade Commission (ITC) on two separate occasions, only the details from the first lawsuit are relevant to Defendants' dispositive motions. The first action, *In re Certain Rubber Antidegradants, Components Thereof, and Products Containing Same (Antidegradants I)*, Inv. No. 337-TA-553, was filed in 2005. The key issue in that action was the construction to be given to the term "controlled amount" of protic material in the '063 and '111 patents when aniline is the solvent. The Administrative Law Judge (ALJ) adopted Flexsys's definition of "controlled amount," which contained unspecified upper and lower limits designed to ensure the desired selectivity for 4-ADPA intermediates without inhibiting the reaction of nitrobenzene and aniline, rejecting Sinorgchem's definition, which focused on the presence of no greater than " up to about 4%" protic material. Applying this definition, the ALJ found that Sinorgchem had literally infringed upon the patents-in-suit. On appeal, the ITC rejected this definition, and determined that "controlled amount" of protic material was "an amount up to that which inhibits the

reaction of aniline with nitrobenzene." Under this new definition, the ITC likewise found literal infringement.

The Federal Circuit reversed the ITC's decision, adopting, instead, the definition previously urged by Sinorgchem. *Sinorgchem v. ITC*, 511 F.3d 1132 (Fed. Cir. 2007). The court turned to a portion of the '063 patent specification, which provided:

> A "controlled amount" of protic material is an amount up to that which inhibits the reaction of aniline with nitrobenzene, e.g., up to about 4% $H_2O$ based on the volume of the reaction mixture when aniline is utilized as the solvent.

('063 patent, col. 4, ll.48-52.) The Federal Circuit found that, by this language, the drafter had expressly defined the term "controlled amount" when aniline was the solvent. In so ruling, the court noted that the term "controlled amount" was set off by quotation marks—"often a strong indication that what follows is a definition." *Sinorgchem*, 511 F.3d at 1136. Further, the term was followed by "is," which signified that the patentee was acting as his own lexicographer. *Id*. The Federal Circuit concluded that "the drafter clearly, deliberately, and precisely defined the term 'controlled amount' of protic material […]." The court found telling the fact that "[e]lsewhere in the same paragraph, the specification again refers to the 4% limit." *Id.*

Applying its definition of "controlled amount," the court found that there was no literal infringement. In reaching this conclusion, the court relied, in part, upon the parties' stipulation before the ITC that Sinorgchem always used between 10 and 15% water throughout the reaction of aniline and nitrobenzene. *Sinorgchem*, 511 F.3d at 1140-41. The court remanded the matter to the ITC for consideration of the question of infringement under the doctrine of equivalents. On remand, the ITC determined that

Sinorgchem did not infringe under the doctrine of equivalents, and the ITC approved of this decision without taking a position on the ALJ's findings with respect to the doctrine of equivalents. (Doc. No. 268, Exs. F and G, respectively.)

*The Present Lawsuit*

Plaintiff filed the present action on January 28, 2005. The matter has been stayed on multiple occasions in anticipation of rulings in the ITC actions. On April 24, 2009, the Court granted Plaintiff's motion to reopen the case. (Doc. No. 184.) In the Amended Complaint, Flexsys alleges that Sinorgchem's processes for producing 4-ADPA and alkylated derivatives of A-DPA, including 6PPD, is covered by Flexsys's patents. (Doc. No. 65, Ex. 1, First Amended Complaint at ¶¶ 13-16.) Flexsys further alleges that Sinorgchem imported 6PPD into the United States, with full knowledge of the Flexsys patents, in violation of 35 U.S.C. § 271(g), and induced others to infringe the Flexsys patents, in violation of 35 U.S.C. § 271(b). (*Id*. at ¶¶ 17-18.)

Flexsys raises similar allegations against the Kumho defendants. Specifically, Flexsys alleges that, collectively, the Kumho defendants are responsible for utilizing 4-ADPA that had been produced using Flexsys's patented process to manufacture tires containing 6PPD, and importing 6PPD and tires containing 6PPD into the United States, in violation of § 271(g). (*Id*. at ¶¶ 21-25, 31-35, 38-39.) Flexsys also claims that KKPC and Kumho Tire Co., Inc. induced others to infringe the Flexsys patents, in violation of 35 U.S.C. § 271(b). (*Id*. at ¶¶ 28, 33.)

*Claim Construction*

The case proceeded to claim construction. After extending the parties an opportunity to brief the issue, and after conducting a *Markman* hearing on October 30,

2009, the Court issued its ruling--familiarity with is presumed. Affording deference to the Federal Circuit's decision, the Court found that "new" evidence offered by Flexsys did not dissuade it from concluding, like the Federal Circuit, that Flexsys had acted as its own lexicographer when it defined the term "controlled amount of protic material" as: "an amount up to that which inhibits the reaction of aniline with nitrobenzene, e.g., up to about 4% $H_2O$ based on the volume of the reaction mixture when aniline is used as the solvent." (Doc. No. 282, Claim Construction Memo. Op. at 28, citing '063 patent, col. 4, ll.48-52, and '111 patent, col. 5, ll.43-47.) The Court also found that the terms "controlling the amount of said protic material […]" and "the amount of protic material in Step(b) is controlled" were used interchangeably with "controlled amount of protic material," and were entitled to a similar construction. (*Id.* at 30.) Finally, the Court defined the terms "suitable solvent system" and "solvent system" as "a solvent or mixture of solvents." (*Id.* at 31.)

### Summary Judgment

On summary judgment, Sinorgchem argues that based upon the Court's definition of "controlled amount," which limits the reach of the patents to processes that use "up to about 4%" water when aniline is the solvent, it does not literally infringe the patents-in-suit because "there can be no genuine dispute that Sinorgchem's process always uses more than 10% water in the condensation reaction."[5] (Doc. No. 268 at 1.)

---

[5] Throughout motion practice, the parties have discussed whether Sinorgchem's process "infringes" upon the Flexsys patents. However, Sinorgchem produces 4-ADPA and 6PPD outside of the United States. As such, Flexsys seeks to hold Sinorgchem liable as an importer under 35 U.S.C. § 271(g). "When the process is used abroad is the same as the process covered by a United States patent, liability for infringement arises only upon importation, sale or offers, or use in the United States as set forth in § 271(g)." *Ajinomoto Co. v. Archer-Daniels-Midland Co*., 228 F.3d 1338, 1348 (Fed. Cir. 2000). Nonetheless, for ease of discussion, the Court will also use infringement terminology in its analysis of Sinorgchem's process.

Sinorgchem also argues that numerous legal theories block the application of the doctrine of equivalents.

The Kumho defendants maintain that they are also entitled to summary judgment because none of them practice all of the steps in the multi-step 6PPD process, and that they do not exercise any control over Sinorgchem's process.[6] (Doc. No. 275 at 1.) In addition, they argue that there can be no infringement under 35 U.S.C. § 271(g) because "the 4-ADPA KKPC purchases from Sinorgchem is 'materially changed' in the process of making the 6PPD and tires that are imported into the United States."[7] (*Id.* at 2.)

On April 12, 2010, the Court conducted a hearing on the dispositive motions. The motions are now fully briefed and ripe for decision.

## II. Standard

"Infringement, whether literal or under the doctrine of equivalents, is a question of fact." *Cook Biotech Inc. v. Acell, Inc*., 460 F.3d 1365, 1373 (Fed. Cir. 2006). "In the summary judgment setting, the proper inquiry is whether or not, drawing all justifiable inferences in favor of the non-moving party, the evidence is such that a reasonable jury could return a verdict for the non-movant." *Ortho-McNeil Pharm., Inc. v. Ceraco Pharm. Labs. Ltd.,* 476 F.3d 1321, 1326 (Fed. Cir. 2007) (citing *Cook Biotech Inc*., 460 F.3d at 1373).

---

[6] KKPC does produce 6PPD through a reductive alkylation process that involves two steps. In the first step, the 4-ADPA is combined with methyl isobutyl ketone to form "imine" compound. (Doc. No. 275, Ex. 1, Declaration of Gregory Fu at § 6; Lim Decl. at ¶ 4.) In the second step, the "imine" compound is hydrogenated in the presence of a platinum catalyst to make the finished 6PPD compound. (*Id.*) When 6PPD is utilized in the manufacture of tires, six additional steps are taken. (Lim Decl. at ¶ 5.)

[7] Kumho also argues that it cannot be held liable under 35 U.S.C. § 271(g) because it does not "direct or control" Sinorgchem's process of making 4-ADPA. (*Id.*)

The entry of summary judgment is not a disfavored procedural shortcut, but instead is mandated by "the plain language of Rule 56(c) […] after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing a motion for summary judgment may do so with "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.* at 324. The nonmovant must show more than a scintilla of evidence to overcome summary judgment. *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party "must present significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). In addition, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex*, 477 U.S. at 324.

Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A non-movant is not permitted to rest upon the allegations in the complaint, but must produce affirmative evidence supporting its claims. *Celotex*, 477 U.S. at 324.

### III. Flexsys's "Motion for Clarification"

Before the Court can address the dispositive motions, it must resolve a motion filed by Flexsys styled "Motion for Clarification of the Court's Construction of '111 Patent Claim 29." (Doc. No. 287.) By its motion, Flexsys seeks a determination that the Court's construction of the term "controlled amount of protic material" does not apply to Claim 29, which indicates that the "amount of protic material present at the beginning of the reaction is up to about 13.8 volume % water […]." ('111 patent, Claim 29, col. 22, ll.57-59.) Because Claim 29 identifies an amount of water at the beginning of the process that is greater than "up to about 4%," Flexsys contends that the definition selected by the Court cannot possibly apply. According to Flexsys, the Court failed to construe the term "controlled amount" in this particular claim. Flexsys is mistaken.

At the claim construction stage, Flexsys advocated for a definition of "controlled amount of protic material" that contained unspecified upper and lower ranges, and further represented that this same definition should apply to all claims in the patents, including Claim 29 of the '111 patent.[8] (*See* Doc. No. 213, Claim Construction Chart.) In support of this construction, Flexsys directed the Court's attention to several claims, including Claim 29, which set forth amounts of protic material greater than "about 4%." Flexsys argued that the existence of these claims counseled against "imposing an upper limit on the amount of water under all reaction conditions when aniline is the solvent." (Doc. No. 227, Flexsys's Opening Claim Construction Brief at 7.)

---

[8] In particular, Flexsys sought the following definition: "An amount of protic material up to that which inhibits the reaction of aniline with nitrobenzene and a minimum amount which is necessary to maintain selectivity of the desired products. The term 'inhibits' refers to when the reaction of aniline with nitrobenzene is no longer significant." (Claim Construction Chart at 1-2.)

The Court devoted an entire section of its Memorandum Opinion on claim construction to discussing these claims, and the examples upon which these claims were based, and provided detailed analysis as to why these claims did not warrant a departure from the Federal Circuit's decision in *Sinorgchem*. (*See* Claim Construction Memo. Op. at 21-24.) With respect to Claim 29, which was based upon Example 15 of the '111 patent, the Court reasoned:

> Flexsys challenges the Federal Circuit's observation that, with respect to Example 15, 'Flexsys has not explained how the presence of 13.8% water at the beginning of the reaction is necessarily inconsistent with a 'controlled amount' of 4% during the operative part of the reaction.' *Sinorgchem,* 511 F.3d at 1140, n.6. While the experts agree that 'the operative part of the reaction' is that point after all the necessary reactants are present (TR at 94, 98, 101, 253), the '111 patent provides that the reaction takes place over a period of 4 hours and 5 minutes ('111 patent, col. 16, ll.5-9). Thus, it is possible to reconcile the Circuit's observation in Footnote 6 with the testimony of the experts, leaving this Court with no definitive evidence that would support a contrary ruling.

(Memo. Op. at 24, n.15.) Finding no reason to depart from the Federal Circuit's definition, which encompassed Claim 29, the Court ruled that its definition applied to Claim 29.

Having squarely addressed this issue at claim construction, the Court must construe Flexsys's motion as one for reconsideration.[9] Although a motion for reconsideration is not mentioned in the Federal Rules of Civil Procedure, it is often treated as a motion to alter or amend pursuant to Rule 59(e). *McDowell v. Dynamics*

---

[9] In light of the fact that the Court quite clearly addressed Flexsys's argument, the Court cannot so easily dismiss Defendants' suggestion that Flexsys styled the motion as one for "clarification" in order to avoid the admonition in the Court's Case Management Plan and Trial Order warning that counsel who file "unfounded, unmerited, and unsuccessful motions for reconsideration simply because they disagree with a ruling, decision, or order should expect to be sanctioned to the full extent permitted under Rule 11 and 28 U.S.C. § 1927." (Doc. No. 198, CMPTO at 7-8.) The Court will, however, give Flexsys and its counsel the benefit of the doubt and not consider sanctions at this time.

*Corp. of Am.*, 931 F.2d 380, 382 (6th Cir. 1991). The purpose of a motion to alter or amend judgment is to request reconsideration of matters "properly encompassed in a decision on the merits." *Osterneck v. Ernst & Whitney*, 489 U.S. 169, 174 (1989). "It is not the function of a motion to reconsider either to renew arguments already considered and rejected by a court or 'to proffer a new legal theory or new evidence to support a prior argument when the legal theory or argument could, with due diligence, have been discovered and offered during the initial consideration of the issue.'" *McConocha v. Blue Cross & Blue Shield Mut. of Ohio*, 930 F. Supp. 1182, 1184 (N.D. Ohio 1996) (quoting *In re August, 1993 Regular Grand Jury*, 854 F. Supp. 1403, 1408 (S.D. Ind. 1994)). In other words, Rule 59(e) is not designed to give an unhappy litigant an opportunity to relitigate matters already decided. *See Dana Corp. v. United States*, 764 F. Supp. 482, 488-89 (N.D. Ohio 1991).

Generally, only three situations justify a district court in altering or amending its judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or to prevent a manifest injustice. *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (citing *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998)). None of these situations is present in this case.

Having previously argued that the term "controlled amount of protic material" should be interpreted the same for all claims where aniline is the solvent, Flexsys now argues that Claim 29 "needs no interpretation because it is expressly defined by the claim itself: 'the amount of protic material present at the beginning of the reaction is up to about 13.8% volume water based on the total volume of the reaction mixture.'"

12

(Doc. No. 288 at 5, quoting '111 patent, col. 22, ll.46-59.) This represents a new argument that "could, and should have been made before," and is, therefore, improperly raised for the first time on reconsideration. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998). *See, e.g., Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007) ("Under Rule 59(e), parties cannot use a motion for reconsideration to raise new legal argument, that could have been raised before a judgment was issued.")

Even if the Court were to consider this new argument, it would not be inclined to revise its ruling on claim construction. In support of its argument, Flexsys relies upon a set of calculations contained in the prosecution history relating to Claim 29, which showed that the water content was 13.8% "at [the] start of [the] reaction." (*See* Doc. No. 225, Ex. 9 at 111-088, Appendix C.) This evidence is of little value because it would appear that this calculation was made before any nitrobenzene was added.[10] Because the experts agree that the "operative part of the reaction" is that point after all the necessary reactants are present (Claim Construction TR at 94, 98, 101, 253), a calculation made prior to the introduction of all the necessary reactants fails to bring Flexsys any closer to establishing that the Court's definition of "controlled amount of protic material" cannot encompass Claim 29.

Ultimately, the Court finds that this is not one of those rare motions that brings to the Court's attention an intervening change of controlling law, the availability

---

[10] The calculations make no reference to nitrobenzene. Given the fact that the calculations clearly set forth when the other elements of the equation were added (i.e., the water and aniline), it seems unlikely that the nitrobenzene was also added.

of new evidence, or the need to correct a clear error or prevent manifest injustice. As such, it is improperly raised at this time. Moreover, the newly minted theory offered in the motion fails to convince the Court that it should disturb its ruling on claim construction. Nonetheless, to the extent that Flexsys is entitled to, and the parties are in need of, clarification, the Court reiterates that the definition of "controlled amount of protic material" identified in its February 8, 2010 Memorandum Opinion should be consistently applied throughout both of the patents-in-suit, and specifically applies to Claim 29 of the '111 patent.

### III. Sinorgchem's Summary Judgment Motion

As it did before the ITC, Sinorgchem argues that its process for creating 4-ADPA and 6PPD cannot literally infringe upon the patents-in-suit because its process always uses more than 10% water in the reaction. Flexsys takes issue with this representation, suggesting that the amount of protic material used by Sinorgchem is much closer to the "up to about 4%" utilized by Flexsys in its patented process. Flexsys also suggests, however, that the Court need not even reach the issue of the amount of water used because it contends that Sinorgchem's process uses two solvents, aniline and methanol, taking it beyond the scope of the Court's definition of "controlled amount of protic material."

#### 1. Methanol is not Utilized as a Solvent

There is no dispute that the Court's definition of "controlled amount of protic material" is limited to processes that utilize aniline as the solvent. (*See* Memo. Op. at 28.) During discovery, Flexsys secured samples from Sinorgchem's plants in China.

An analysis of these samples showed levels of methanol in the reaction mixture.[11]

According to Flexsys:

> The presence of methanol means that the solvent used in the reaction of aniline and nitrobenzene in Sinorgchem's process is not just excess aniline, as Sinorgchem contends, but a ***mixture*** of aniline and methanol. Such a solvent mixture is expressly disclosed in the patents-in-suit as an alternative to using just excess aniline as the solvent: "***solvent mixtures*** can be utilized wherein one or more of the suitable solvents and another solvent, such as a controlled amount of protic solvent, e.g., methanol, are combined.

(Doc. No. 289 at 4, citing '063 patent, col. 3, ll.43-47, emphasis in original.)

One component of Sinorgchem's "complex base catalyst" (Cat1) is a raw material, the major component of which is TMAH, which, in turn, is made with methanol. (Doc. No. 328, Summary Judgment TR at 54; Doc. No. 321, Sinorgchem Reply at 3, n.5.) For purposes of summary judgment, Sinorgchem concedes that a small amount of methanol from the mixture is present in the overall condensation reaction mixture. (Summary Judgment TR at 55.) Sinorgchem insists, however, that the Court's definition of "controlled amount of protic material" still applies because only aniline is serving as the solvent for the reaction. Moreover, Sinorgchem maintains that the "up to about 4%" water limitation "is completely consistent with the presence of both methanol and aniline in Sinorgchem's condensation process." (Reply at 4.)

The Court begins with the language of the patent claims. *See Comark Communications v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("The appropriate starting point […] is always with the language of the asserted claim itself.")

---

[11]Samples of the raw material that Sinorgchem uses to make the "complex base catalyst" (Cat1), revealed between .06-2.1 vol.% methanol. Testing detected up to .567 vol.% methanol in samples of the condensation reaction mixture. (Doc. No. 297, Declaration of Robert Maleczka at ¶ 19; Doc. No. 296, Declaration of Eric Uffman at ¶¶ 37, 46.)

The Court reads the claims "in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995). *See Philips v. AWH Corp*., 415 F.3d 1303, 1315 (Fed. Cir. 1996); *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis.")

The patents draw an important distinction between reactants that serve as "solvents" and those that serve as "protic solvents." The '063 patent teaches that a suitable solvent system can include solvents "such as, for example, dimethylsulfoxide, N-methylpryolidone, dimethylformamide, aniline, pyridine, nitrobenzene and the like, as well as mixtures therefore." ('063 patent, col. 3, ll.37-40.) It goes on to provide that a solvent mixture can be utilized "wherein one or more of the suitable solvents and another solvent, *such as a controlled amount of protic solvent, e.g., methanol*, are combined." (*Id*., col. 3, ll.44-47, emphasis added.) While aniline is specifically identified as a solvent, and identified as one of several solvents that can be used in the process, methanol is set apart and reserved for separate treatment as a "protic solvent."

The term "protic solvent" is used interchangeably with the term "protic material" in the patents-in-suit. ('063 patent, col. 3, ll.46-47 (methanol as protic solvent); col. 4, l.31 (water as protic material); col. 5, ll.10-13 (methanol and/or water as protic material); col. 9, Ex. 3 (water as protic material)).[12] Both phrases refer to a substance that is capable of donating a proton to the reaction. As discussed at claim construction, the

---

[12] Similar references are found in the '111 patent. ('111 patent, col. 4, 11.23-28 (methanol as protic solvent); col. 5, ll.27-30 (water as protic material); col. 6, ll.3-4 (methanol and/or water as protic material); col. 10, Ex. 3 (water as protic material)). Claims 11, 40, and 71 of the '063 patent also identify methanol and water and mixtures thereof as protic solvents or protic materials.

patents teach that control of this protic material, or protic solvent, is important. ('063 patent, col. 4, ll.31-39.) Too little protic material will result in a nonselective reaction containing too much of the undesired product and too little of the desired product. In contrast, too much protic material will inhibit the reaction and result in low yield. (*Id.*)

That methanol, like water, serves in the role of donating protons, instead of serving as a solvent for the reaction, is evident from a review of the claims. Claim 41 of the '063 patent identifies a solvent system that includes aniline as the solvent and water as the protic material. Claim 42 also uses water as the protic material, but identifies dimethylsulfoxide as the solvent. In much the same way, Claim 43 identifies aniline as the solvent and uses methanol in exactly the same way water is used as the protic material in Claims 41 and 42.

Flexsys simply cannot escape the language of its own patents and, in particular, the language of its claims. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002) (it is "the claim language [that] defines the bounds of claims scope") (citing *Bell Comm. Research Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 619-20 (Fed. Cir. 1995)). Methanol, like water, serves as the protic material for the reaction. The fact that the patentees chose to use the term "protic solvent" interchangeably with "protic material" does not alter this conclusion, and, in fact, only further emphasizes the unique role methanol and other protic solvents have in the process.

Further, the patents provide that a suitable solvent system can include a

solvent, such as aniline, and a protic solvent, such as methanol or water.[13] ('063 patent, col. 3, ll.37-47; Claim 12 (solvent system includes aniline and water); Claim 43 (solvent system includes aniline and methanol)). In these claims, it is clear that aniline is serving as the solvent and water or methanol is serving as the protic material. Thus, the Court's definition of "controlled amount of protic material" can still apply, even when methanol is present in the process.[14]

### 2. Sinorgchem's Process Uses More than "About 4%" Water

Even if the Court's definition of "controlled amount of protic material" applies, Flexsys claims that the record supports a finding that Sinorgchem's process infringes upon the patents. While Sinorgchem alleges that it always uses more than 10% water, Flexsys claims to be in possession of evidence that shows that the percentage of water used by Sinorgchem is much closer to the "about 4%" practiced in the patents.

To this argument, Sinorgchem cries "foul." Sinorgchem is quick to remind the Court that Flexsys stipulated before the ITC and the Federal Circuit that

---

[13] This conclusion is consistent with the Court's definition of suitable solvent system as "a solvent or mixture of solvents." (Claim Construction Memo. Op. at 31.) There is no question that water and methanol are solvents. They are, however, further set apart from other solvents and qualified as "protic solvents." Thus, the combination of a solvent and a protic solvent can be described as a "mixture of solvents" under the Court's definition.

[14] It is telling that Flexsys cannot point to a workable definition of "controlled amount of protic material" that would apply in a case where methanol is present with aniline and water. At oral argument, Flexsys stated that the appropriate definition would be "the amount [] that up to which inhibits the reaction," and suggested that the public should look to the yield to determine whether a particular process is covered by the patent. If the yield is acceptable, according to Flexsys, the process is covered. (Summary Judgment TR at 70-71.) At claim construction, the Court rejected a similar definition as indefinite under 35 U.S.C. § 112. (See Claim Construction Memo. Op. at 26.) Further, Flexsys admits that nowhere in the patents is the public directed to look for this undefined "acceptable" yield. (Summary Judgment TR at 71.)

18

Sinorgchem's process uses between 10 and 15% water. *Sinorgchem*, 511 F.3d at 1140; (*see* Doc. No. 268, Ex. E, Stipulation at ¶ 4.) Sinorgchem argues that Flexsys is now judicially estopped from asserting a contrary position here.

(a) *Judicial Estoppel*

This Court applies the law of the Sixth Circuit in determining whether judicial estoppel applies. *Source Search Tech. v. Lendingtree, LLC*, 588 F.3d 1063, 1071 (Fed. Cir. 2009) ("Whether judicial estoppel applies is a matter of regional circuit law.") "'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *Lorillard Tobacco Co. v. Chester, Wilcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). The doctrine's purpose is to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749-50. Parties cannot abuse the process by "playing fast and loose with the courts." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002). *See also Reynolds v. Comm'r*, 861 F.2d 469, 472 (6th Cir. 1988) (judicial estoppel is a rule against "having [one's] cake and eating it too.")

The Sixth Circuit examines three factors to determine whether to apply judicial estoppel: (1) whether the party's later position is clearly inconsistent with its early position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later

proceeding would create the perception that the court was previously misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Lewis v. Weyerhaeuser Co*., 141 Fed. App'x 420, 425 (6th Cir. 2005). Judicial estoppel is "an equitable doctrine invoked by the court at its discretion." *New Hampshire*, 532 U.S. at 750.

Sinorgchem argues that all three factors are present here inasmuch as Flexsys's new position is clearly inconsistent with its earlier position in the ITC proceedings, Flexsys succeeded in persuading the ITC and the Federal Circuit to accept its contrary position, and to allow Flexsys now to take a contrary position as to the percentage of water used by Sinorgchem would permit Flexsys to realize an unfair advantage. Seeking to escape the reach of judicial estoppel, Flexsys argues that "it gained no unfair advantage from reluctantly stipulating to Sinorgchem's representation regarding the amount of water in its process during the trial in the ITC […]." (Doc. No. 289 at 29.)

"The requirement that the position be successfully asserted means that the party must have been successful in getting the first court to accept the position. Absent judicial acceptance of the inconsistent position, application of the rule is unwarranted because no risk of inconsistent results exists." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982). While Flexsys does not deny that it was successful in getting the ITC and the Federal Circuit to accept and rely upon the stipulation, it insists that something more is required before judicial estoppel applies. At oral argument, Flexsys suggested that the requirement of success in the prior proceeding carries with it the understanding that the party making the assertion benefited from the contrary assertion.

20

Because Flexsys did not benefit from its stipulation with Sinorgchem, it argues that judicial estoppel should not be used now to bar a contrary position. (Summary Judgment TR at 47-48.)

Courts are split as to whether the prior assertion must have resulted in a benefit to the party making it in order for judicial estoppel to block a subsequent contrary assertion. *See Ryan Operations v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3rd Cir. 1996) (a party need not have benefited from a prior inconsistent position in order for judicial estoppel to apply). *Contra Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1548 (7th Cir. 1990) ("The offense is not taking inconsistent positions so much as it is winning, twice, on the basis of incompatible positions.") *See also Armco Inc. v. Glenfed Fin. Corp.*, 746 F. Supp. 1249, 1257 (D. N.J. 1990) ("Judicial estoppel is usually applied where the party changing its position benefitted from the assertion of its prior contradictory position.") There is, at least, some indication that in this judicial district there must be a finding that a benefit accompanied a successfully asserted contrary assertion before judicial estoppel may apply.[15] In the unreported decision, *U.S. v. Hammon*, 277 Fed. App'x 560, 566 (6th Cir. 2008), the Sixth Circuit observed that "[j]udicial estoppel is […] generally limited to circumstances where a party asserts a position in litigation that is adopted by the court, gains an advantage through

_____

[15] The Third Circuit, in *Ryan Operations*, observed, in dicta, that the Sixth Circuit requires a party to benefit from a prior inconsistent position before judicial estoppel may be invoked, and cited *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595 (6th Cir. 1982), as support for its position. *See Ryan Operations*, 81 F.3d at 361 n.3. The Court does not read *Edwards* as expansively as the Third Circuit. In *Edwards*, the Sixth Circuit merely found that the plaintiff had not prevailed with an inconsistent position in a prior action for veterans' benefits because the award of benefits in the prior proceeding was the result of a settlement and not the adoption of the plaintiff's previous inconsistent position. 690 F.2d at 599.

that assertion, and then attempts to assert a clearly opposite position in a later proceeding."

It is true that Sinorgchem, and not Flexsys, benefitted from the prior stipulation. Indeed, the Federal Circuit relied on this stipulation in ruling against Flexsys on the issue of literal infringement. *Sinorgchem*, 511 F.3d at 1140. Nonetheless, this Court need not weigh in on the question of whether a benefit is necessary before it can apply judicial estoppel. Even if the Court permits Flexsys to offer evidence that contradicts its prior stipulation, it still cannot establish literal infringement.[16]

> *b) Flexsys's Evidence of Sinorgchem's Percentage of Water Used does not Support a Finding of Literal Infringement*

The '063 patent provides that the "amount of water present in certain reagents can be determined by utilizing a Karl-Fischer apparatus." ('063 patent, col. 5, ll. 16-17.) Flexsys underscores the fact that Sinorgchem did not utilize a Karl-Fischer apparatus to measure its water usage, but, instead, employed gas chromatography. According to Flexsys, this is Sinorgchem's fatal flaw. Flexsys's expert, Dr. Eric Uffman of Chemir, opines that the Karl-Fischer method is a more reliable method than gas

---

[16] Flexsys also argues that its decision to enter into the previous stipulation was "based on Sinorgchem's factual representations […], which recent discovery has shown to be an incomplete and inaccurate representation of Sinorgchem's process." (Opp. at 29.) In so arguing, Flexsys relies upon case law providing that judicial estoppel does not apply "if […] the new, inconsistent position is the product of information neither known nor readily available to [a party] at the time the initial position was taken." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 25 (1st Cir. 2004). *See Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (judicial estoppel does not apply where there is "inadvertence due to lack of knowledge.") Sinorgchem counters by noting that Flexsys has been aware since 2005 that Sinorgchem utilized the gas chromatography method for testing the water percentages in its process, and that this method could lead to different measurements. (Reply at 4.) Again, the Court need not address this factual dispute because even viewing the evidence in a light most favorable to Flexsys, as this Court must on summary judgment, the Court still concludes that no literal infringement has taken place.

chromatography for measuring water content in the condensation reaction mixture. (Uffman Decl. at ¶ 34.)

Applying the Karl-Fischer method, Dr. Uffman measures the water content of Sinorgchem's condensation reaction mixture to be as low as 8.26 wt.% at one point in the process, and as low as 8.72 wt.% at another point in the process. (Uffman Decl. at ¶ 31, Ex. 13.) Dr. Maleczka offers theoretical calculations, which would suggest that the water content is actually as low as 5.24 wt.%.[17] (Maleczka Decl. at ¶ 25.) Even assuming the lowest of Flexsys's water calculations—5.24%, Flexsys cannot prove literal infringement.[18]

To prove literal infringement, Flexsys must show that "each limitation in the asserted claim [can] be found present in the accused device or process." *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582 (Fed. Cir. 1995) (citing *North Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1574 (Fed. Cir. 1993)).

---

[17] Sinorgchem challenges Dr. Maleczka's calculations, noting that they are not based on actual measurements but are merely theoretical and are based on the desalting process, which Sinorgchem argues is not part of the continuous condensation reaction. Rather, Dr. Maleczka merely theorizes that a reaction between aniline and the residual nitrobenzene *could* occur during the desalting operation. (Maleczka Decl. at ¶ 27, wherein he states "Because all of the necessary reaction components and conditions are present, I see no reason to conclude that the reaction between aniline and nitrobenzene is inoperative during the desalting operation.") While Sinorgchem invites the Court to afford no weight to these calculations as "theoretical speculation," citing *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043 (Fed. Cir. 2001), the Court reminds Sinorgchem that it must view all of evidence in the light most favorable to Flexsys on summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1999). Moreover, unlike the expert opinion in *Novartis*, the methodology employed by Dr. Maleczka is not "hidden in an uncommented computer model." *Novartis*, 271 F.3d at 1054. Rather, his methodology is clearly set forth in his declaration, and is properly considered by this Court.

[18] Flexsys suggests that Dr. Maleczka's calculation of 5.24% is based on Sinorgchem's 10-15 wt.% range for water content, which Chemir's measurements demonstrate is higher than the actual ranges of water content in Sinorgchem's process. The inaccuracy of Sinorgchem's water content range permits the inference that the water content is actually lower than 5.2 and therefore within the literal scope of "about 4%." (Doc. No. 289 at 15 (citing Maleczka Decl. at ¶¶ 25, 29, 30).) Yet, Flexsys disregards Sinorgchem's calculations because they were achieved using "the wrong method." (*Id.* at 15.) Flexsys, however, makes much of the fact that its experts relied on the Karl-Fischer technique. (Doc. No. 290 at 15.) Thus, Flexsys cannot claim that its results should be further expanded because of a technique it did not employ.

"Conversely, there is no infringement if the accused device or process is missing one of the elements in the asserted claim." *Innovention Toys, LLC v. MGA Entm't, Inc*., 665 F. Supp. 2d 636, 645 (E.D. LA 2009) (citing *Johnston v. IVAC Corp*., 885 F.2d 1574, 1577-78 (Fed. Cir. 1989)). Thus, the Court must determine whether a water content of 5.24% is literally encompassed by the "about 4%" set forth in the asserted claims.

"The word 'about' does not have a universal meaning in patent claims." *Cohesive Tech., Inc. v. Waters Corp*., 543 F.3d 1351, 1368 (Fed. Cir. 2008). As such, the meaning depends on the science of the particular case. *See Pall Corp. v. Micron Separations, Inc*., 66 F.3d 1211, 1217 (Fed. Cir. 1995). *See, e.g., Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 821-22 (Fed. Cir. 1988). "When 'about' is used as part of a numeric range, 'the use of the word 'about,' avoids a strict numerical boundary to the specified parameter. Its range must be interpreted in its technologic and stylistic context.'" *Cohesive Tech., Inc*, 543 F.3d at 1368 (quoting *Pall*, 66 F.3d at 1217). "In determining how far beyond the claimed range the term 'about' extends the claim, '[w]e must focus [...] on the criticality of the [numeric limitation] to the invention.'" *Id*. (quoting *Ortho-McNeil Pharm.,* 476 F.3d at 1327).

In *Pall Corp.*, the Federal Circuit was confronted with the question of whether the term "*about* 5:1 to *about* 7:1" ratio of methylene to amide groups included the ratio of 4:1 that was found in the accused structure. In determining whether 4:1 infringed, the court noted that it was appropriate to consider the effects of varying the parameters, "for the inventor's intended meaning is relevant." *Id*. at 1217. The district court found that the evidence showed that while a ratio of 7:1 produced satisfactory results, higher ratios did not. At the lower end, evidence showed that tests involving a 3:1

resin were also clearly unsatisfactory. Based upon this evidence, and the fact that the inventor identified "about 5:1" as the lower limit, the court affirmed the district court's conclusion that a ratio of 4:1 fell outside the "about 5:1 to about 7:1" ratio in the claims.[19] *Id*. at 1218.

Similarly, the examples in the patents teach that increasing the water content to a level of 4.7% and beyond when aniline is the solvent will yield unacceptable results. Specifically, Example 3, Table 2, Run 4 shows that using 4.7% water causes the yield to drop from 0.18 mmole to .05 mmole, an unacceptably low level. *Sinorgchem*, 511 F.3d at 1139. Thus, the upper limit of the "about 4%" cannot extend to 4.7%, and the 5.24% Flexsys maintains is present in Sinorgchem's process falls outside of the scope of the relevant claims. *See, e.g., Pall*, 66 F.3d at 1218. As such, there can be no literal infringement.

### 3. *There is No Infringement Under the Doctrine of Equivalents*

Flexsys argues, however, that even if there is no literal infringement, the 5.24% water content can still be found to infringe the patents-in-suit based upon the doctrine of equivalents. In essence, Flexsys contends that 5.24% water is the equivalent of "up to about 4%."

The doctrine of equivalents is simply not available to Flexsys in the present case to extend the 4.7% upper limit of the "about 4%" claim language to encompass 5.24%. "[B]y electing to include the broadening word "about' in the claim, the patentee has in this case already captured what would otherwise be equivalents within

---

[19] In *Pall*, no experiments were performed between 3:1 and 5:1. Nonetheless, the Court noted that the results at 3:1 were "clearly unsatisfactory." *Id*. at 1218.

the literal scope of the claim." *Cohesive Tech*., 543 F.3d at 1372. "Where, as here, a patentee has brought what would otherwise be equivalents of a limitation into the literal scope of the claim, the doctrine of equivalents is unavailable to further broaden the scope of the claim." *Id.* ("The patentee here has, by its choice of claim language, captured the same 'range of novelty' that typically justifies application of the doctrine of equivalents.") By using the term "about" in its definition of "controlled amount of protic material," Flexsys has already defined the outer range for covered protic material percentages at under 4.7%. The doctrine of equivalents cannot be utilized to extend that range any further.[20]

Other legal barriers exist to block Flexsys from access to the doctrine of equivalents. As set forth below, the Court finds that Flexsys specifically excluded the use of water in amounts greater than "up to about 4%, that the application of the doctrine of equivalents would vitiate the claims, that Flexsys dedicated amounts of water greater than "about 4%" to the public, and that the prosecution history serves as an estoppel to finding infringement on a theory of equivalents.

---

[20] Flexsys also attempts to establish equivalence through the expert opinion of Dr. Maleczka. In his declaration, Dr. Maleczka states that he performed certain experiments at a certain temperature higher than that used by Flexsys in its process but within the range set forth in Sinorgchem's patent application (U.S. 2009/0048465), and concluded that "an upper limit of allowable water of about 21% at this temperature, as in Sinorgchem's process, is equivalent to an upper limit of "about 4% $H_2O$" at room temperature, as in Example 3. In other words, as the temperature increases, the optimal amount of protic material increases, as does the amount of protic material required to inhibit the reaction." (Maleczka Decl. at ¶ 51.) This opinion is of little value inasmuch as Dr. Maleczka is relying upon the open-ended definition of "controlled amount," or as he describes it "the optimal amount," that was specifically rejected by the Court at claims construction. Dr. Maleczka's belief that as you vary certain conditions the amount of water needed to achieve optimal results will also vary brings Flexsys no closer to establishing that the amount of water used by Sinorgchem is legally equivalent to the no more than 4.7% used in the patents.

(a)     *Specifically Excluded or Disavowed[21]*

"A particular structure can be deemed outside the reach of the doctrine of equivalents because that structure is clearly excluded from the claims whether the exclusion is express or implied." *Scimed Life Sys., Inc., v. Advanced Cariovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001). By defining a claim in a way that clearly excludes certain subject matter, the patentee may "implicitly disclaim[] the subject matter that was exclude and thereby [be] barred […] from asserting infringement under the doctrine of equivalents." *Id.* at 1346.

A patentee may specifically exclude certain processes or products by identifying the various options available and selecting what it views as the best, or by describing the features of the product or process and then criticizing those products or processes that lack this all important feature. *See, e.g., Astrazeneca AB v. Mutual Pharm. Co., Inc.*, 384 F.3d 1333 (Fed. Cir. 2004). In *Astrazeneca AB*, the specification touted the fact that the invention utilized surfactant solubilizers and criticized other products utilizing non-surfactant solubilizers. The Federal Circuit found that this act "operate[d] as a clear disavowal of these other products (and processes using these products)." *Id.* at

---

[21] Flexsys argues that "there is nothing in the Federal circuit majority opinion inconsistent with Judge Newman's observation [in the dissent] that:

> A patentee can reduce or disclaim claim scope to cover less than what is described in the specification. Here, however, there was no disclaimer of the scope set forth in the patent specifications and claims […].

*Sinorgchem*, 511 U.S. at 1141 (Newman, C.J., dissenting). The issue of infringement under the doctrine of equivalents was not, however, before the Federal Circuit. Indeed, the Federal Circuit remanded to the ITC for determination of the existence of infringement under that doctrine.

1340. *See, e.g., SciMed Life Sys.*, 242 F.3d at 1344 (criticism of prior dual lumen in favor of coaxil lumen constituted a disavowal of dual lumen arrangements).

      The patents-in-suit emphasize the importance of controlling the amount of protic material, and warn that utilizing amounts of water greater than about 4% when aniline is the solvent will inhibit the reaction to "the extent where the reaction is no longer significant." ('063 patent, col. 4, ll.31-37; '111 patent, col. 5, ll.27-33.) By clearly and specifically defining the term "controlled amount of protic material" to be limited to an amount which is "up to about 4% $H_2O$ based on the volume of the reaction mixture when aniline is utilized as the solvent," the patentee excluded processes, such as Sinorgchem's, that use more than "up to about 4%" water.[22]

      b)  *Vitiate*

      Under the doctrine of equivalents, "[a]n equivalent must be found for every limitation of the claim somewhere in an accused device [...]." *Corning Glass Works v. Sumitomo Electronics U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed. Cir. 1989). The legal doctrine of vitiation precludes a finding of infringement where such a finding "would entirely vitiate a particular claim element." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39, n.8 (1997). *See, e.g., Novartis Pharmaceuticals Corp. v. Eon Labs Manufacturing, Inc.*, 363 F.3d 1306, 1312 (Fed. Cir. 2004) (application of

---

[22] Such a result is consistent with an important principle of patent law, which recognizes that "between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure." *Sage Prods. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997). Even after it filed the '063 patent, Flexsys had an opportunity to change the reach of the term "controlled amount of protic material," but failed to do so. It chose, instead, to carry the same limitation through the '111 patent.

doctrine of equivalents would vitiate a claim requirement that the particulate dispersion in the process occur outside the body).

Here, the application of the doctrine of equivalents to Sinorgchem's process, with its use of at least 5.24% water, would have the effect of writing the "up to about 4%" water limitation out of the claims. The patents-in-suit go to some length to emphasize the criticality of controlling the amount of water in the process, and this Court determined at claim construction that the designated amount of water was critical to the patented process. As such, the Court cannot treat the difference in water levels as irrelevant without disregarding this important claim limitation. *See, e.g., Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed Cir. 1998) (treating shape of cup implant as "irrelevant" to bring alleged infringing product within the doctrine of equivalents would have been impermissible under the "all-limitations" rule because it would have written the "generally conical outer surface" limitation out of the claims); *Ortho-McNeil Pharm., Inc.*, 476 F.3d at 1328 (weight ratio of pharmaceutical composition was critical to patented drug, and application of the doctrine of equivalents would necessarily vitiate the asserted claims.)

c)  *Disclosure/Dedication*

"A patent applicant who discloses but does not claim subject matter has dedicated that matter to the public and cannot reclaim the disclosed matter under the doctrine of equivalents." *PSC Computer Prods., Inc. v. Foxconn Int'l*, 355 F.3d 1353, 1355-5 (Fed. Cir. 2004) (citing *Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 1996)). Consequently, the use of subject matter that has been dedicated to the public cannot constitute infringement. *Id.* at 1356.  *See Scimed Life Sys.*,

242 F.3d at 1341 ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.")

The selected definition of "controlled amount of protic material" in the patents puts the public on notice that the patents only claim processes that utilize "up to about 4%" water when aniline is the solvent. Table 2 of Example 3 of the '063 patent clearly discusses the use of 4.7% water, and notes that it yields an unacceptably low result. In doing so, the patentees have dedicated to the public processes, like that of Sinorgchem's, that utilize more than 4.7% water.[23]

(d)  *Prosecution History Estoppel*

One final barrier blocks the way to the doctrine of equivalents—prosecution history estoppel. Under this theory, a patentee may not extend "the range of equivalents accorded the device or process to subject matter relinquished during prosecution of the patent." *Texas Instruments Inc. v. U.S I.T.C.*, 988 F.2d 1165, 1173 (Fed. Cir. 1993). *See Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1250-51 (Fed. Cir. 2000). *See also Forest Labs, Inc. v. Abbott Labs*, 239 F.3d 1305, 1313-14 (Fed.

---

[23] Flexsys highlights the fact that Example 10 of the '063 patent does not specifically disclose the amount of protic material used, but routine calculations suggest that the amount is substantially greater than "about 4%. According the Flexsys, evidence surrounding Claim 10 means either that the Court's claim construction is inaccurate, or the amount of water is not specifically disclosed in Example 10, meaning that the disclosure-dedication rule does not apply. (Doc. No. 289 at 26.) Like the Federal Circuit, this Court found that it was appropriate to exclude this "preferred embodiment" from its interpretation of the term "controlled amount of protic material" because the example was not even directed to the critical pursuit of controlling the amount of protic material. (Claim Construction Memo. Op. at 24-25 (citing *Sinorgchem*, 511 F.3d at 1139)). As such, the existence of this example neither calls into question the Court's claim construction, nor nullifies the patentee's clear dedication to the public of processes that use greater than 4.7% water.

Cir. 2001) ("arguments made during prosecution lead to the conclusion that the claims should be limited to their literal scope"). "Prosecution history estoppel can occur as a result of (i) amendments made to overcome patentability rejections or (ii) arguments made during prosecution that show 'a clear and unmistakable surrender' of subject matter." *Bayer AG*, 212 F.3d at 1251 (quoting *Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817, 828 n.3 (Fed. Cir. 1996)). In addition, "[u]nmistakable assertions made by the applicant to the Patent and Trademark Office (PTO) in support of patentability, whether or not required to secure allowance of the claim, also may operate to preclude the patentee from asserting equivalency between a limitation of the claim and a substituted structure or process step." *Texas Instruments*, 988 F.2d at 1174.

In support of the '111 patent, the applicants argued that the presence of a "controlled amount of protic material" was missing from the prior art. They further argued "that neither [the] Whol reference nor Frimer et al., teach conducting the reaction of aniline and nitrobenzene in the presence of a controlled amount of protic material." (Doc. No. 225, Ex. 9, Prosecution History at 111-084.) Indeed, the applicants highlighted the fact that:

> It was applicants who discovered the criticality of controlling the amount of protic material present in the reaction of aniline or substituted aniline derivatives with nitrobenzene. Specifically, neither reference teach controlling the amount of protic material during the reaction by either use of a desiccant or continuous distillation.

(*Id.*).

The prosecution history shows that the inventors placed special emphasis on controlling the amount of protic material. The inventors also clearly and un-mistakenly defined that term to mean an amount "up to about 4%" water when aniline is

31

the solvent. By stating that the process at issue was patentable because of the attention to the control of the protic material, and by defining that term with very specific limitations, Flexsys surrendered all subject matter outside of the process claimed in the patents-in-suit. *See, e.g., Texas Instruments*, 988 F.2d at 1175.

4. *Indirect Infringement Under 35 U.S.C. § 271(b)*

Flexsys also claims that Sinorgchem induced infringement under 35 U.S.C. § 271(b). Section 271(b) provides that "whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). In order to succeed on a claim of induced infringement, the patentee must first show that there has been direct infringement and second that the alleged infringer knowingly and intentionally caused another to directly infringe an asserted claim. *3M v. Chemque, Inc.*, 303 F.3d 1294, 1304-05 (Fed. Cir. 2002). *See Joy Technologies v. Flakt, Inc.*, 6 F.3d 770, 774-75 (Fed. Cir. 1993) ("Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement.") As such, "[u]pon a failure of proof of direct infringement, any claim of inducement of infringement also fails." *Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1033 (Fed. Cir. 2002). Because Flexsys's direct infringement claim cannot survive summary judgment, its claim under § 271(b) for inducement must also fail. *See, e.g., Moleculon Research Corp. v. CBS, Inc.*, 872 F.2d 407, 410 (Fed. Cir. 1989) ("In the absence of direct infringement, CBS cannot be held liable for inducing infringement under section 271(b).")

*Conclusion on Sinorgchem's Summary Judgment Motion*

Flexsys has failed to come forward with any genuine issues of material fact that would lead a reasonable juror to find in favor of Flexsys on the issue of literal infringement or infringement under the doctrine of equivalents. Further, in the absence of evidence of direct infringement, Flexsys cannot maintain a claim against Sinorgchem for inducement. Defendant Sinorgchem's motion for summary judgment is **GRANTED**.[24]

## IV. Kumho's Summary Judgment Motion

Kumho also seeks summary judgment. At the outset, it is important to note that while 35 U.S.C. § 271(g) creates an additional remedy against an importer of a patented process, a claim under this statute cannot be maintained if the accused process does not violate the patented process. *See Trs. of Columbia Univ. v. Roche Diagnostics GmbH*, 272 F. Supp. 2d 90, 100 (D. Mass. 2002) ("If the product shipped by Roche into the United States was made by a process that did not directly infringe upon Columbia's patents, then Roche cannot have violated Section 271(g).") Because this Court has ruled that Sinorgchem's process does not infringe upon Flexsys's patent process, there can be no liability under § 271(g) against either set of defendants. Thus, the same reasons that support summary judgment in favor of Sinorgchem similarly support the summary dismissal of the claims against Kumho.[25]

---

[24] Sinorgchem also argues that it cannot be held liable under 35 U.S.C. § 271(g) because the 4-ADPA it makes in China, which is purchased by Kumho, is "materially changed" by Kumho in order to make 6PPD and IPPD. Because this argument forms the basis for Kumho's dispositive motion, discussion of this point will be reserved for the analysis of Kumho's motion.

[25] Similarly, the absence of direct infringement also serves to defeat Flexsys' claim of inducement under § 271(b). *See Minnesota Min. & Mfg. Co*., 303 F.3d at 1304-05. *See, e.g., Moleculon Research Corp*., 872 F.2d at 410. In so ruling, the Court rejects Flexsys's suggestion that Kumho did not request a ruling on Flexsys's § 271(b) claim. Kumho clearly argued that the § 271(b) allegations would fail in the event that Flexsys could not properly support its claims of direct infringement. (*See* Doc. No. 275 at 18; *see* Doc. No. 320 at 15, n.9.)

Kumho, however, offers an additional reason why it is entitled to summary judgment. Specifically, Kumho argues that the 4-ADPA KKPC purchases from Sinorgchem is "materially changed" when it is converted into 6PPD and IPPD.[26] Section 271(g) provides:

> Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent. [...] *A product which is made by a patented process will*, for purposes of this title, *not be considered to be so made after—*
>
>> (1) *it is materially changed by subsequent processes*; or
>> (2) it becomes a trivial and nonessential component of another product.

35 U.S.C. § 271(g) (emphasis added).

"The 'materially changed' exception of § 271(g) requires, at a minimum, that there be a real difference between the product imported, offered for sale, sold, or used in the United States and the products produced by the patented process." *Bio-*

---

[26] Kumho further argues that it is not liable under § 271(g) because it does not direct or control the actions of Sinorgchem, and, in particular, it does not control the process by which Sinorgchem creates the 4-ADPA that Kumho purchases. In support of this argument, Kumho relies on Federal Circuit decisions holding that "where the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008) (citing *BMC Res,, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380 (Fed. Cir. 2007)). Kumho has failed, however, to offer any authority for the proposition that the "direct or control" standard applies to cases brought under 35 U.S.C. § 271(g). Other courts have suggested that the details of who did what in the manufacturing process are of no consequence in a § 271(g) case. *See Trustees,* 272 F. Supp. 2d at 108 ("[I]t is irrelevant under Section 271(g) who manufactured the goods so long as the goods were manufactured using a patented process. Instead, under the statute, liability attaches to one who, without authority, *imports* a product made by a patented process into the United States.") (emphasis in original); *Nuance Communs. Inc. v. TellmeNetworks, Inc.*, 2010 U.S. Dist. LEXIS 39388, at *33 (D. Del. April 20, 2010) (rejecting the argument that an inducer of infringement must be "mastermind behind the infringement," noting that "control is not a necessary condition for a finding of inducement liability"). Because as discussed supra, Kumho is entitled to summary judgment for the additional reason that the 4-APDA it imports is "materially changed," the Court need not reach the question of whether the "control or direction" inquiry is proper under § 271(g).

*Technology Gen. Corp. v. Genetech, Inc*., 80 F.3d 1553, 1560 (Fed. Cir. 1996). Flexsys argues that the changes from 4-ADPA to 6PPD cannot be considered "material" because the changes are "both described and claimed in the Flexsys Patents." (Doc. No. 290, Opp. to Kumho Mot. at 24.)

If, indeed, the production of 6PPD was claimed within the patents, the Court would agree that the "material change" exception could not apply. *See id.* (an importer of met-hGH could not argue that its product of hGH was "materially changed" where the production of hGH was also contained within the literal scope of the claim.) As noted elsewhere, however, the patents-in-suit focus on the initial stage of the process; wherein aniline is coupled directly with nitrobenzene, thus eliminating the chlorine that was traditionally utilized in the first stage and resulted in highly corrosive chlorinated waste by-products. (Doc. No. 227, Flexsys' Markman Opening Brief at 1; '063 patent, col. 2, ll.16-24.) The remaining two stages, including the stage where 4-ADPA is converted to 6PPD, are admitted in the prior art, and cannot, therefore, be covered by the patented claims. ('063 patent, col. 1, ll.23-25, col. 5, ll.53-64, col. 6, ll.3-14; '111 patent, col. 6, ll.3-14.)[27]

The Federal Circuit was faced with a similar situation in *Eli Lilly and Co. v. American Cyanamid Co*., 82 F.3d 1568 (Fed. Cir. 1996). There, an importer was accused of importing an intermediate product, which is the principal component of a patented drug, Cefaclor. The patent holder argued that an intermediate product of a

---

[27] Both patents admit that these other steps were widely practiced before the patentees first sought to patent their non-chlorinated process. ('063 patent, col. 1, ll.23-25, col. 5, ll.53-64, col. 5, ll.3-14; '111 patent, col. 1, ll.31-33, col. 7, ll.12-22 and ll. 31-42.)

patented process should not be considered "materially changed" if the principal commercial use of the intermediate product lies in its conversion into the product which is alleged to have been infringed. In essence, the patent holder argued that, because the primary use of the imported substance was the patented drug, any change in the substance that results in the patented drug—no matter how significant—cannot be considered "material" under 35 U.S.C. § 271(g).

The court refused to "stretch" the language of § 271(g) to read into it a requirement that looks more to the economic value of the patented process than the nature of the change. Instead, the court indicated that, "[i]n the chemical context, a 'material' change in a compound is most naturally viewed as a significant change in the compound's structure and properties." *Eli Lilly*, 82 F.3d at 1573. The court then turned to the legislative history of 35 U.S.C. § 271(g) for further guidance as to how to evaluate a change in an intermediate chemical product, making reference to a two-phased test contained in a 1987 Senate Report. In the first phase of the test, a product "will be considered made by the patented process […] if it would not be possible or commercially viable to make that product but for the use of the patented process." *Id*. at 1576 (citing S. Rep. No. 83, 100th Cong., 1st Sess. 49 (1987)).  The second phase of the test provided that:

> A product will be considered to have been made by a patented process if the additional processing steps which are not covered by the patent do not change the physical or chemical properties of the product in a manner which changes the basic utility of the product [produced] by the patented process. However, a change in the physical or chemical properties of a product, even though minor, may be 'material' if the change relates to a physical or chemical property which is an important feature of the product produced by the patented process. Usually a change in the physical form of a product (e.g., the granules to powder, solid to liquid) or minor

36

> chemical conversion, (e.g., conversion to a salt, base, acid, hydrate, ester, or addition or removal of protection group) would not be a 'material' change.

*Id*. at 1577 (quoting S. Rep. No. 83.)

While the Federal Circuit did not embrace the Senate Committee's two-phase test as "a conclusive answer to the question of how the 'materially changed' clause should be construed," it did find it helpful in resolving the question posed by the patent holder. *Id*. at 1578. With respect to the first phase, the court found evidence that there were in practice other commercially viable processes for making the intermediate product. As for the second phase of the test, the court found that the change from the intermediate product to Cefaclor was "material" because the chemical properties of the two compounds were completely different, the basic "utility" of the products was different, and the chemical structure of the two products was "significantly different." *Id*. at 1577.

This Court also finds the two-phase test helpful in resolving the question of whether the intermediate product Kumho purchases from Sinorgchem is "materially changed" prior to its importation. Looking to the first phase, Flexsys concedes that there are other commercially viable alternative processes for making 4-ADPA in use today that do not employ the process claimed in the patents-in-suit. (Doc. No. 275, Ex. 8, Deposition of Donald Fields at 171-172.) The existence of these alternative processes satisfies the first phase of the test, even if Sinorgchem does not practice any of these

methods.[28] *See Eli Lilly*, 82 F.3d at 1577 ("[U]nder the test set forth in the Senate report, it is enough to defeat the claim of infringement that there is another way of producing the intermediate, even if the alleged infringer does not use that alternative process.")

The second phase of the test also points to a finding of a "material change." The process of converting 4-ADPA into 6PPD and IPPD, referred to as "reductive alkylation," involves two chemical steps. In the first step, "two hydrogens bound to the terminal nitrogen of 4-ADPA have been replaced with a double bond between the terminal nitrogen and the alkyl chain. In the second step, the imine is reduced to make 6PPD and IPPD." (Doc. No. 275 Ex. 1, Declaration of Gregory Fu at ¶ 6.) The end result is an added hydrogen to each end of the carbon-nitrogen double bond of the imine. (*Id.*) The difference in the chemical structure between 4-ADPA and the end product of 6PPD results in different chemical properties. 4-ADPA is 500 times more soluable in water than 6PPD. (*Id.* at ¶ 8.) Also, the melting point of 4-ADPA and 4-ADPA intermediates is significantly higher than the melting point of 6PPD.[29] (*Id.*)

The difference in the chemical and biological properties of 4-ADPA and 6PPD is further borne out in the difference in the utility of the two substances. Flexsys's Product Data sheet for 6PPD describes 6PPD as "a powerful antioxidant and antiozonant for natural and synthetic elastomer compounds and as a synthetic polymer stabilizer." (Fu Decl. at ¶ 9, Ex. D.) The Product Data sheet further provides that 6PPD exhibits

---

[28] Flexsys suggests that the other commercial processes should be disregarded because they are inferior to the process claimed in the patents-in-suit. Flexsys offers no support for this restrictive reading of the first phase of the Senate Committee's test.
[29] The process by which 4-ADPA intermediates are converted into 4-ADPA and then 6PPD incorporates a significant chemical change in the product that goes beyond the mere change in physical form (such as the "conversion to a salt, base, acid, hydrate, ester, or addition or removal of a protection group"). (*Id.* at ¶ 7.) *See Eli Lilly*, 82 F.3d at 1577 (citing S. Rep. No. 83).

"excellent high temperature, fatigue and flex resistance to rubber compounds." (*Id*.) Further, Flexsys's expert, Dr. Robert Maleczka, states that "PPDs are a critical component of tire rubber because in the absence of PPDs, the rubber would quickly degrade, drastically shortening the useful life of a tire." (Maleczka Decl. at ¶ 88.)

There is no evidence that 4-ADPA, or 4-ADPA intermediates, have any commercial utility as a tire antidegrant. (Fu Decl. at ¶¶ 10, 12.) 4-ADPA does, however, have commercial utility as "dyes, such a hair dyes," and 4-ADPA intermediates "have been used as [...] test reagents in a biological assay, a component of liquid crystals and a stabilizer for rocket motor propellants." (*Id*. at ¶¶ 10, 14-15.)

Flexsys argues, however, that the alkylation process is similar to that involved in *Pfizer Inc. v. F & S Alloys & Minerals Corp*., 856 F. Supp. 808 (S.D.N.Y. 1994), wherein the court found that a "material change" had not occurred. (Maleczka Decl. at ¶¶ 80-81.) It is clear from the record, however, that the chemicals and alkylation process involved here are different from those at issue in *Pfizer*. (*See* Fu Decl. at ¶ 6; Lim Decl. at ¶ 4.) The conversion, here, results in a product that is different in structure, properties, and utilities, taking a substance that has no commercial utility as a tire antidegrant and converting it into one that is a "critical component of tire rubber [...]."[30] (Maleczka Decl. at ¶ 88.)

---

[30] Flexsys's reliance on *Marion Merrell Dow v. Am. Cyanamid Co.*, No. 92-5198, 1994 U.S. Dist. LEXIS 5950, *7-9 (D.N.J. May 4, 1994), is equally unavailing as this case is easily distinguished. In *Marion Merrell Dow*, the claimed precursor chemical had the "same basic utility" as the end product chemical. *Id.* at *21. In addition, the end product chemical was the "only" commercially saleable product that could be made from the claimed precursor chemical. *Id.*

*Conclusion on Kumho's Summary Judgment Motion*

Kumho has demonstrated that a "material change" occurs when 4-ADPA is converted into 6PPD before it is imported into the United States by Kumho, and Flexsys has failed to come forward with any evidence that would create a genuine issue of material fact on the question of Kumho's liability under 35 U.S.C. § 271(g).[31] Likewise, the absence of evidence of direct infringement forecloses Kumho's liability under § 271(b). For all of the forgoing reasons, as well as the reasons set forth in the Court's analysis of Sinorgchem's motion for summary judgment, Kumho's summary judgment motion is **GRANTED**.

## V. Conclusion

For all of the reasons set forth in this Memorandum Opinion, Sinorgchem's motion for summary judgment (Doc. No. 268) is **GRANTED**. Defendant Kumho's motion for summary judgment (Doc. No. 275) is also **GRANTED**.

**IT IS SO ORDERED**.

Dated: July 15, 2010

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[31] Of course, the 4-ADPA undergoes an even greater "material change" when it is ultimately incorporated into an automobile tire. When 6PPD is used in the manufacturer of tires, there are many additional steps involved including: "(1) mixing 6PPD and other additive compounds with rubber, (2) calendaring the fabrics and steel cord and coating them with rubber, (3) extruding the treads and sidewall components, (4) manual assembly of the tire components on tire building machines, (5) vulcanizing the tire with heat and pressure, and (6) final finishing, including inspection, storage and shipping." (Lim Decl. at ¶ 4.)